IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 15, 2019 Session

## WILLIE LEE HUGHES, JR. v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Williamson County**
**No. CR-170485     Michael Binkley, Judge**

_____

**No. M2019-00248-CCA-R3-PC**

_____

A Williamson County jury convicted Petitioner, Willie Lee Hughes, Jr., of aggravated robbery, for which he received a sentence of twenty-five years' incarceration.[1] Petitioner filed for post-conviction relief, which was denied following an evidentiary hearing. Petitioner appeals, asserting that he was denied the effective assistance of counsel based on trial counsel's failure to: (1) explore racial bias during jury selection; (2) challenge the lack of diversity in the venire; (3) advise Petitioner of his right to allocution at sentencing; and (4) argue on appeal that the trial court erred by failing to declare a mistrial after being advised of an interaction between jurors and Petitioner's son. Following a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Vakessha Hood-Schneider, Franklin, Tennessee, for the appellant, Willie Lee Hughes, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Kim R. Helper, District Attorney General; and Mary Katharine White, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] In October 2011, the Williamson County Grand Jury charged Petitioner with one count of aggravated robbery in case number I-CR105947. Petitioner's case was scheduled for trial on October 10, 2012, but Petitioner failed to appear. He was later indicted for failure to appear in case number I-CR126935. Petitioner pled guilty to that charge and received a four-year sentence consecutive to his twenty-five-year sentence. The claims raised in the instant petition for post-conviction relief, however, do not relate to Petitioner's conviction for failure to appear.

# OPINION

## I. Factual and Procedural Background

On direct appeal, this court summarized the evidence at trial as follows:

[Petitioner's] aggravated robbery case proceeded to trial in May 2014. The State's proof at trial established that, at approximately 6:00 a.m. on August 18, 2011, Maria Jaimes was drinking coffee outside her place of employment, Brentwood Magic Cleaners, when a black male accosted her with a large knife. The assailant placed the knife against Ms. Jaimes's stomach and demanded that she "give [him] everything" before taking her iPod, cellular telephone, and handbag. The assailant then ran to a light-colored Chevrolet Blazer parked in front of a nearby hotel and fled the scene; a white shirt concealed the vehicle's license plate. Ms. Jaimes reported the robbery to her manager, who in turn called the police.

Brentwood Police Department ("BPD") Officer Stanley Boyd responded to the scene and spoke with Ms. Jaimes, who provided a description of the assailant and his vehicle. Upon learning that the assailant had stolen Ms. Jaimes's cellular telephone, Officer Boyd requested that the cellular carrier "ping" the telephone's location. The "ping" returned a location in north Nashville, and Officer Boyd advised officers with the Metropolitan Nashville Police Department ("Metro"), who responded to the location.

Metro Officers Kevin Cooley and Andrew Johnson arrived at the location at approximately 7:30 a.m., and about 30 minutes later, they observed a grey Blazer pull into the driveway of 1806 Elizabeth Road. The officers approached the driver of the vehicle, who identified herself as Lynne Edmonds. While the officers were speaking with Ms. Edmonds, [Petitioner] walked out of the house and identified himself to the officers. [Petitioner] admitted to Officer Cooley that he had been driving the Blazer earlier that morning. Ms. Edmonds gave officers consent to search the Blazer, and Officer Johnson discovered a large folding knife in the rear of the vehicle. At that point, Metro officers contacted BPD detectives and informed them that "we may have got your guy."

Shortly thereafter, BPD Detective James Colvin arrived at the scene and spoke with [Petitioner]. After Detective Colvin provided [Petitioner] with his *Miranda* warnings, [Petitioner] stated that he had been at the

Elizabeth Road residence "[a]ll morning" and adamantly denied any involvement in the robbery. Eventually, [Petitioner] admitted that someone named "K.C." was driving the Blazer that morning, that K.C. had parked in front of the hotel, and that K.C. returned to the Blazer holding a woman's handbag. [Petitioner] insisted that he had never gotten out of the Blazer.

Detective Colvin attempted to locate K.C. without any success, and in his subsequent interview with Ms. Jaimes, she stated that [Petitioner] was the only person she saw in the Blazer.

On August 22, 2011, [Petitioner] requested to speak with Detective Colvin at the Brentwood Police Department. Detective Colvin again administered *Miranda* warnings to [Petitioner], and [Petitioner] signed a waiver of his rights. Initially, [Petitioner] maintained that the robbery had been K.C.'s idea and that he had remained in the Blazer while K.C. committed the robbery. Upon further questioning by Detective Colvin, [Petitioner] eventually admitted, "It was me, me by myself." [Petitioner] confessed that Ms. Jaimes's cellular telephone and iPod were at the Elizabeth Road residence. Although he was unable to find Ms. Jaimes's handbag, which [Petitioner] stated he had thrown out of the Blazer following the robbery, Detective Colvin recovered the telephone and iPod from the Elizabeth Road residence and returned the items to Ms. Jaimes.

With this evidence, the State rested. Following a *Momon* colloquy, [Petitioner] elected not to testify and chose not to present any proof. Based on the evidence presented, the jury convicted [Petitioner] as charged of aggravated robbery.

Following a sentencing hearing, the trial court sentenced [Petitioner] as a Range III, persistent offender to a term of [twenty-five] years' incarceration.

*State v. Willie Lee Hughes, Jr.*, No. M2015-01207-CCA-R3-CD, 2016 WL 6956804, at *1-2 (Tenn. Crim. App. Nov. 29, 2016), *perm. app. denied* (Tenn. Feb. 16, 2017). This court affirmed Petitioner's judgments of conviction, and the Tennessee Supreme Court denied further review.

Thereafter, Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of counsel, Petitioner filed an amended petition. At an evidentiary hearing, Petitioner testified that trial counsel was first appointed as "elbow counsel" because Petitioner intended to represent himself. However, Petitioner

eventually asked for trial counsel to fully represent him because Petitioner felt that he "didn't have all the legal material [he] needed to represent [him]self[.]" Petitioner stated that he met with trial counsel "maybe once or twice" before trial. He said that they discussed trying to get Petitioner's statement to police suppressed but that they did not discuss trial strategy. Petitioner agreed that trial counsel discussed with him the evidence that would be presented at trial and that trial counsel wrote letters to him in response to Petitioner's letters.

Petitioner recalled that, after jury selection, trial counsel approached the trial court and said that Petitioner "might have an issue not having a black juror to select from." Petitioner stated that his trial was not fair because trial counsel did not do anything to follow up on the issue of the lack of any black jurors in the venire. Petitioner stated that trial counsel asked questions of the potential jurors and discussed with him which jurors to strike. Petitioner said that he could not recall how many challenges trial counsel actually used to strike jurors.

Petitioner testified that trial counsel failed to make him aware of his right to allocution before the sentencing hearing. Petitioner stated that, if he had known he could make an allocution statement, he would have asked the trial court to "have sympathy on [him] for the fact that [Petitioner] only did what [he] did to try to pay rent[.]" Petitioner agreed that he told Detective Colvin that his motive behind the robbery had been that he "had bills to pay[.]" Petitioner acknowledged that the trial court was aware of his statement to Detective Colvin regarding why he committed the offense, even though he did not make an allocution statement at sentencing.

Petitioner testified that trial counsel failed to preserve several issues that should have been presented on appeal. Petitioner said that trial counsel did not discuss with him the issues to be raised on appeal even though Petitioner sent trial counsel letters regarding "things [he] thought [trial counsel] should have raised[.]" Petitioner stated that he was not given the opportunity to review the appeal before it was filed. He acknowledged that trial counsel filed a motion for new trial but stated that trial counsel did not raise the same issues Petitioner mentioned in his letters to trial counsel.

On cross-examination, Petitioner agreed that he robbed the victim and that she was able to provide police with a description of a vehicle that Petitioner had borrowed from a family member. Petitioner further agreed that the family member testified that Petitioner was driving the vehicle at the time of the offense. Petitioner explained that he eventually confessed to committing the robbery and that he told police where some of the stolen items could be found. Petitioner agreed that trial counsel talked with him about the weapon used in the robbery.

- 4 -

Regarding trial counsel's representation, Petitioner recalled that trial counsel "said he was going to try to get that weapon suppressed because he [did not] feel like it was a deadly weapon." Petitioner acknowledged that, if trial counsel had been able to convince the jury that the weapon was not a "deadly weapon," he could have been convicted of a lesser offense. Petitioner agreed that trial counsel attempted to get his statement to police suppressed and that trial counsel was successful in having portions of the statement redacted.

Petitioner's girlfriend, Cintrelle Reed-Colbert, testified that she was present for Petitioner's trial and that she had an interaction with two male jurors during a break in the trial. She stated that, as she and Petitioner's son were going to lunch, they saw two jurors in the parking lot who could not get their car to start. Ms. Reed-Colbert asked the jurors if they needed help, and they said, "Yes, we think our car won't start, we don't know what's wrong with it[.]" Ms. Reed-Colbert replied, "Well, I can give you a jump, and I have a gallon of water in my car; [it] sounds like it could be the battery." She explained that she helped them get their car started and recalled that her conversation with the jurors was limited to "the battery thing or the spark plugs" and "the jumper cables[.]" She explained that Petitioner's son also spoke to the jurors, but she did not know what they talked about.

On cross-examination, Ms. Reed-Colbert recalled that she was called to testify about her interactions with the two male jurors during a break in the trial. She said that she was asked several questions about their conversation but that she was not asked about Petitioner's son's presence during the interaction with the jurors.

Detective James Colvin testified that he was the lead detective in the case. He explained that he testified at Petitioner's trial and sentencing hearing and that there had been "an abundance of evidence" against Petitioner. Detective Colvin agreed that he and two male jurors provided testimony on the last day of trial about "inadvertent juror contact[.]" He recalled that the testimony was similar to what Ms. Reed-Colbert said about "someone having car trouble" and that, ultimately, the trial court found that "there were no concerns" and that nothing had been said about the trial. Regarding the interaction, Detective Colvin explained:

I didn't know what I was walking into; so my interaction in person and up close with them was extremely brief, a matter of seconds. I turned around, went back to my car, and notified Franklin Police Department there was a disabled vehicle in order to alleviate the issues that could be occurring at that moment, and I waited in the parking lot for a few minutes and then left. [I] never saw anything inappropriate, I never heard anything

inappropriate, and I certainly didn't engage in any more conversation than I had to.

Trial counsel testified that he was initially appointed to represent Petitioner as advisory counsel but that, eventually, Petitioner asked for trial counsel to fully represent him. Trial counsel testified that he was prepared to go to trial. He identified letters that he had written to Petitioner that indicated he sent Petitioner copies of the aggravated robbery and robbery statutes, as well as a copy of the statute for the intoxication defense. Trial counsel also provided Petitioner with interview transcripts.

Trial counsel recalled that he discussed the defense of intoxication with Petitioner. Regarding the defense strategy, trial counsel stated:

> [T]he defenses that I raised were, number one, that the object was not a deadly weapon, as it was . . . a lawn tool. My argument was that it wasn't capable of really puncturing the skin or hurting anybody and, second, that [Petitioner] was intoxicated at the time of the incident, as to negate one of the mens rea elements of what he was charged with.

Trial counsel agreed that the proof against Petitioner was strong and included Petitioner's confession to the robbery. Trial counsel identified an attorney activity worksheet that he kept during his representation of Petitioner. He noted that the worksheet indicated that he reviewed documentation, filed motions, met with Petitioner at the jail several times, reviewed discovery, and wrote letters to Petitioner. Trial counsel also identified a trial outline, which he prepared prior to trial. Trial counsel explained that he asked that the trial court declare the case to be extended and complex, and the court granted the request.

Trial counsel recalled an incident that occurred during trial in which Detective Colvin and one of Petitioner's family members had "some contact that turned out to be incidental with some jurors." Trial counsel explained, "That was explored on the record during the court, and while it was found that some contact occurred, my recollection is that there was no evidence that it had influenced anything." Trial counsel said that he conducted research after trial on the issue and concluded that

> there had to be evidence that there was some kind of . . . outside force brought upon the jury . . . in order to rise to a level of there being an error. And here . . . my conclusion was just a mere incidental contact with no discussion of the case or anything like that was not enough to warrant relief.

- 6 -

Trial counsel stated that he did not raise the issue of juror misconduct or interference on appeal because he did not believe it was a viable issue in light of his research.

Regarding Petitioner's claim that he failed to challenge the lack of diversity in the jury venire, trial counsel stated that he checked census records for Williamson County and found that "given the small minority population" that it was "not an odd occurrence for there to be very few minority jurors -- potential jurors in a venire[.]" Trial counsel testified:

> Well, I wanted to see if there was an issue I could raise regarding there not being very many possible minority jurors, and my conclusion . . . was that there was such a small percentage of the population that's minority and . . . I remember in researching it you had to show some type of improper method in summoning the venire in order to prove discrimination, and there was just simply no evidence that I knew of in that regard.

Trial counsel stated that he did not discuss race with potential jurors but that he would have questioned any juror about racial bias if he had "heard anything when [he] was questioning them[.]" Trial counsel noted that some of the State's witnesses, including the victim, were minorities.

Trial counsel stated that he did not specifically recall discussing with Petitioner whether he wanted to make an allocution statement, but trial counsel testified that "it would be [his] standard practice to talk to a client about whether or not they want to take the stand or just give an unsworn statement or allocution" at a sentencing hearing. Trial counsel recalled that he corresponded with Petitioner after trial. Regarding the issues he raised on appeal, trial counsel stated, "I've always proceeded under the understanding that . . . it's the client's decision whether or not to appeal, but as the attorney, I have to decide what issues are viable[.]"

Following the hearing, the post-conviction court filed a written order denying the petition for post-conviction relief. This timely appeal follows.

## II. Analysis

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing

the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

## A. Failure to explore racial bias during jury selection

Petitioner asserts that trial counsel rendered ineffective assistance by failing to explore racial bias during jury selection. Petitioner contends that an "all-white jury" was selected and that trial counsel made no effort to question the jury regarding racial bias during voir dire. Citing *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), Petitioner asserts that trial counsel had a duty to investigate any possible racial bias by asking questions during voir dire to explore such a topic. He contends that such an omission by trial counsel "render[ed] the trial process suspicious and unreliable."

In *Pena-Rodriguez*, two jurors told defense counsel, after the discharge of the jury, that another juror had expressed anti-Hispanic bias against the petitioner and his alibi witness. *Id.* at 861. Defense counsel obtained affidavits from the jurors describing a number of biased statements made by the juror in question, which were submitted to the trial court. *Id.* at 861-62. The trial court acknowledged the juror's apparent bias but, nonetheless, decided it could not consider the affidavits under Colorado's "no-impeachment rule" that prohibited inquiry into statements made by jurors during deliberations. *Id.* at 862. The Supreme Court considered whether an exception to the no-impeachment rule was constitutionally required "when a juror's statements indicate that racial animus was a significant motivating factor in his or her finding of guilt." *Id.* at 867. The Court noted that racial bias was a "familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." *Id.* at 868. Thus, the Supreme Court held that "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal, the Sixth Amendment requires that the no-impeachment rule give way in order to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." *Id.* at 869.

In addressing Petitioner's claim, the post-conviction court stated:

[Petitioner] also submits [trial counsel] was ineffective for not exploring areas of racial bias during voir dire and relies heavily on *Pena-Rodriguez* . . . for the proposition that racial bias must be addressed as a constitutional safeguard. The [c]ourt finds that while such a requirement was announced in *Pena-Rodriguez*, it was premised upon a finding that "one or more jurors made statements exhibiting overt racial bias that cast

- 9 -

serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict." *Id.* at 869. This prerequisite is at odds with the facts of the case at bar wherein there is no indication any jurors made overt racial remarks or exhibited improper racial behavior. Therefore, the [c]ourt does not find [trial counsel] was deficient for not questioning jurors about any racial bias.

The record does not preponderate against the post-conviction court's finding that there was no indication any jurors made overt racial remarks or exhibited improper racial behavior. Trial counsel testified that, although he did not discuss race with potential jurors, he would have questioned any juror about racial bias if he had heard anything indicating a possible bias during his questioning. Moreover, Petitioner presented no proof at the evidentiary hearing that racial animus was a significant motivating factor in one or more jurors' finding of guilt. Petitioner contends that trial counsel had a duty to explicitly ask about racial bias during voir dire based on *Pena-Rodriguez*. We disagree; *Pena-Rodriguez* does not mandate such an inquiry by trial counsel. In *Pena-Rodriguez*, the Court specifically noted "the dilemma faced by trial court judges and counsel in deciding whether to explore potential racial bias at *voir dire*." *Id.* (citing *Rosales-Lopez v. United States*, 451 U.S. 182 (1981); *Ristaino v. Ross*, 424 U.S. 589 (1976)). The Court explained that "[g]eneric questions about juror impartiality may not expose specific attitudes or biases that can poison jury deliberations. Yet more pointed questions 'could well exacerbate whatever prejudice might exist without substantially aiding in exposing it.'" *Id.* (quoting *Rosales-Lopez*, 451 U.S. at 195 (Rehnquist, J., concurring in result)).

Petitioner has failed to establish deficient performance and resulting prejudice under *Strickland*, based on trial counsel's failure to explore racial bias during jury selection. He is not entitled to relief.

### B. Failure to challenge the lack of diversity in the venire

Petitioner also argues that he was denied the effective assistance of counsel based on trial counsel's failure to challenge the makeup of the jury venire. He contends that trial counsel should have examined whether African Americans had been systematically excluded from the jury selection process in Williamson County.

In addressing this issue, the post-conviction court found:

> At the post-conviction hearing, [trial counsel] stated he did not challenge the lack of diversity in the jury venire based on the census records in Williamson County showing a relatively small minority

population. Therefore, [trial counsel] did not believe it was an odd occurrence for there to be very few minority jurors in a given venire.

. . . .

[Petitioner] has failed to meet his burden and show the fair-cross-section-requirement of the Sixth Amendment of the United States Constitution has been violated by any systematic exclusion of a minority group. To the contrary, the [c]ourt takes judicial notice of the overwhelmingly large number of Caucasian individuals residing in Williamson County, Tennessee. The United States Census Bureau shows that 84.8 percent of persons residing in Williamson County are of a Caucasian origin; 4.5 percent are black; 0.3 percent is American Indian and Alaskan Native; 0.1 percent is Native Hawaiian; 1.7 percent is two or more races; and 4.8 percent are Hispanic or Latino.

The [c]ourt finds any underrepresentation of a minority presence in [Petitioner's] trial was not due to a systematic exclusion of any given group, but instead was the result of the actual makeup of the Williamson County community which was fairly represented to [Petitioner] during voir dire.

In this case, trial counsel testified that he researched the issue by checking census records for Williamson County. He stated that, "given the small minority population," it was "not an odd occurrence for there to be very few minority jurors -- potential jurors in a venire[.]" Trial counsel testified that he found no evidence that African Americans had been systematically excluded from the jury selection process in Williamson County, and Petitioner presented no evidence to the contrary at the post-conviction hearing. Thus, Petitioner has failed to establish deficient performance and prejudice under *Strickland*. He is not entitled to relief based on this claim.

### C. Failure to advise Petitioner of his right to allocution

Petitioner contends that he was denied the effective assistance of counsel based on trial counsel's failure to advise him that he could make an allocution statement at sentencing. Petitioner asserts that "he was prejudiced by this lost opportunity" and claims that he would have been able to "persuade the court to give him a more favorable sentence[.]"

Regarding this claim, the post-conviction court found:

[Trial counsel] could not recall whether he specifically discussed one's right to allocution with [Petitioner]. However, [trial counsel] stated it was his standard practice to talk to a client about whether or not they wanted to take the stand or just give an unsworn statement or allocution. In any event, even if [Petitioner] was not aware of his right to allocution and [trial counsel] was deficient in this respect, there is ample evidence that such an oversight would not be prejudicial to [Petitioner] whose statement of allocution would be that "he committed the robbery to pay rent." This would not have changed the outcome of [Petitioner's] ultimate sentence.

Here, the record does not preponderate against post-conviction court's finding that Petitioner's proposed allocution statement would not have affected Petitioner's sentence. Petitioner testified that, if he had known that he could make an allocution statement, he would have told the trial court that he only committed the offense in order to pay his rent. However, Petitioner agreed that he told Detective Colvin that his motive behind the robbery had been that he "had bills to pay[.]" Petitioner also acknowledged that, at the time of sentencing, the trial court was aware of his statement to Detective Colvin regarding why he committed the offense. Thus, the record does not preponderate against post-conviction court's finding that Petitioner's proposed allocution statement would not have affected Petitioner's sentence. Petitioner has failed to establish any prejudice resulting from trial counsel's alleged failure to inform Petitioner of his right to allocution. He is not entitled to relief based on this issue.

### D. Failure to argue on appeal the trial court's failure to declare a mistrial

Lastly, Petitioner contends that he was denied the effective assistance of counsel based on trial counsel's failure to present on direct appeal Petitioner's argument that the trial court erred by failing to declare a mistrial after being advised of an interaction between jurors, Ms. Reed-Colbert, and Petitioner's son. Petitioner argues that, had trial counsel pursued this issue on appeal, "the argument would have been successful."

A defendant has a right to effective representation both at trial and on direct appeal. *Campbell v. State*, 904 S.W.2d 594, 596 (Tenn. 1995) (citing *Evitts v. Lucey*, 469 U.S. 387 (1985)). The test for ineffective assistance of counsel is the same for both trial and appellate counsel, under the *Strickland* standard set forth above. *Id.* That is, a petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was deficient in failing to adequately pursue or preserve a particular issue on appeal and that, absent counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal." *Id.* at 597; *see also Carpenter*, 126 S.W.3d at 886-88.

Regarding claims of ineffective assistance by appellate counsel, our supreme court has provided:

> Appellate counsel are not constitutionally required to raise every conceivable issue on appeal. Indeed, experienced advocates have long emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues.

> The determination of which issues to raise on appeal is generally within appellate counsel's sound discretion. Therefore, appellate counsel's professional judgment with regard to which issues will best serve the appellant on appeal should be given considerable deference.

*Carpenter*, 126 S.W.3d at 887 (internal quotation marks and citations omitted).

When a petitioner alleges that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of that issue. *Id.* "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* Further, when an omitted issue is without merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal and cannot prevail on an ineffective assistance of counsel claim. *Id.* at 887-88. Appellate counsel's professional judgment is entitled to considerable deference with regard to which issues best served the petitioner on appeal. *Id.* at 887.

The post-conviction court found no deficient performance based on trial counsel's failure to raise on appeal the trial court's failure to declare a mistrial following the interaction between the two jurors, Ms. Reed-Colbert, and Petitioner's son. In rejecting this claim, the post-conviction court found:

> [Trial counsel] testified at the [p]ost-[c]onviction hearing on November 19, 2018 that while some incidental contact did occur between Detective Colvin, [Petitioner's] son, Ms. [Reed-]Colbert, and two jurors, there was no evidence there was a discussion of the case which would have been prejudicial to [Petitioner] and influenced the outcome of his trial. As a basis for this conclusion, [trial counsel] recounted the examination by this [c]ourt of the jurors and other individuals who were said to have had a conversation in the parking garage of the courthouse as follows:

>> Q. And we did have testimony about that from certain individuals; is that correct?

A. We did. My recollection is that the [c]ourt was very thorough in questioning the jurors and others involved to see if there was anything going on, and my recollection is that based upon those questions, there was no evidence of that being the case.

In addition, while Ms. [Reed-]Colbert stated to have been present during the conversation between [Petitioner's] son and the individual jurors, she was unable to recount the subject matter of the conversation and whether it involved any extraneous prejudicial information.

. . . .

[T]he [c]ourt recognizes [Petitioner] has failed to produce admissible evidence showing the jury was exposed to extraneous prejudicial information or subjected to an improper influence. It is clear the jurors involved in the conversation testified as witnesses concerning their conduct, and this [c]ourt determined they did not pose a threat to the impartiality of the jury as a whole. Indeed, there has been no evidence whatsoever showing the trial of [Petitioner] was discussed at any length between the jurors. The [c]ourt also finds the testimony of Detective Colvin credible for this [c]ourt's determination that a juror did not get in a car with Detective Colvin or share any familial relation. Therefore, [Petitioner] has failed to prove his factual allegations of impermissible jury contact by clear and convincing evidence. [Trial counsel] was not ineffective for failing to raise this issue given the lack of factual predicate for such a contention.

"A party challenging the validity of a verdict must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." *State v. Adams*, 405 S.W.3d 641, 651 (Tenn. 2013). "Extraneous prejudicial information" encompasses "the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case," and improper outside influence is considered "any unauthorized 'private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury.'" *Id.* at 650-51 (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)). "[W]hen it has been shown that a juror was exposed to extraneous prejudicial information or subjected to improper influence, a rebuttable presumption of prejudice arises, and the burden shifts to the State to explain the conduct or demonstrate that it was harmless." *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005) (citing *State v. Blackwell*, 664 S.W.2d 686, 689 (Tenn. 1984)).

- 14 -

Here, the record shows that the trial court conducted a hearing on the issue and found no improper outside influence. Ms. Reed-Colbert testified that she had an interaction with two male jurors during a break in the trial. She explained that she helped them get their car started and recalled that her conversation with the jurors was limited to "the battery thing or the spark plugs . . . the jumper cables[.]" She explained that Petitioner's son also spoke to the jurors, but she did not know what they talked about. Detective Colvin agreed that he and two male jurors provided testimony on the last day of trial about "inadvertent juror contact[.]" He recalled that the trial court found that "there were no concerns" and that nothing had been said about the trial during the interaction with the jurors.

Trial counsel testified, "That was explored on the record during the court, and while it was found that some contact occurred, my recollection is that there was no evidence that it had influenced anything." Trial counsel said that he conducted research after trial on the issue and concluded that

> there had to be evidence that there was some kind of . . . outside force brought upon the jury . . . in order to rise to a level of there being an error. And here . . . my conclusion was just a mere incidental contact with no discussion of the case or anything like that was not enough to warrant relief.

Petitioner has failed to produce any evidence that the incidental contact threatened the impartiality of the jury. Accordingly, he has not established that counsel was deficient in failing to pursue this issue on appeal. *Campbell*, 904 S.W.2d at 597. Petitioner is not entitled to relief on this claim.

### III. Conclusion

For the aforementioned reasons, the judgment of the circuit court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 15 -